# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**HENRY STACHURA, M.D.,**

       **Plaintiff,**

**vs.**                                                                  **No. CIV 00-1798 JHG/KBM**

**MEMORIAL MEDICAL CENTER, INC.,**
**A Private Non-Profit Corporation, Its**
**Board of Directors, JOHN DOES 1 Through**
**10, (And in its potential Capacity as a County**
**Supported Hospital),**

       **Defendants.**

## MEMORANDUM OPINION

On August 24, 2001, the Court entered the parties' Stipulated Order Concerning

Proceeding on Stipulated Facts, Submitted Record and Trial Briefs for decision on the merits.  The

Stipulated Order set out the proceeding to dispose of this matter.  Both parties have consented to

proceed on the merits based on written submissions.

### I.  Background

On March 20, 2000, Dr. Gene Love, an obstetrician and gynecologist, admitted L.P., a

thirty-eight year old woman, to Memorial Medical Center, Inc.[1] (MMCI) for exploratory

laparoscopic surgery and possible removal of a cyst.  Prior to this surgery, L.P. had undergone a

total abdominal hysterectomy and a bilateral salpingo-oophorectomy[2] and later an exploratory

laparoscopic surgery.  On that day, Dr. Love and Dr. Stachura, a surgeon, operated L.P. at

---

[1]  Memorial Medical Center, Inc. has been an incorporated, non-profit private entity since April 1, 1998.

[2]  A salpingo-oophorectomy is the removal of the ovary and its fallopian tube.  *Stedman's Medical Dictionary* 1567 (26th ed. 1995)

approximately 8:00 a.m. The physicians found L.P. had adhesions, with the small bowel adhered to the abdominal wall and pelvis. The physicians dissected L.P.'s small bowel off the interior abdominal wall of the abdomen and off the sigmoid colon. The small bowel had multiple adhesions which the physicians took down on the left side with short and blunt dissection. The physicians inspected the sigmoid colon. The sigmoid colon was adhered down in the cul-de-sac where L.P. had reported experiencing pain. The physicians freed up this area and inserted a Jackson-Pratt through the abdomen to drain any fluids.

On March 22, 2000, L.P. appeared to be recovering from the surgery. However, at approximately 11:00 a.m., L.P. began vomiting, her temperature increased, and she complained of pain. The nurses contacted Dr. Love and Dr. Stachura and informed them of the vomiting, the elevated temperature, and L.P.'s complaints of pain. At this point, L.P.'s abdomen remained distended but soft. The abdominal x-rays revealed a moderate ileus.[3] L.P. no longer had bowel sounds and her temperature remained elevated.

At 8:00 p.m., the nurses notified the physicians of L.P.'s decrease in blood pressure and increase in her respiratory rate. The physicians ordered oxygen. Dr. Love initiated a bolus of IV fluid. At 9:00 p.m., Dr. Love came to the hospital to evaluate L.P. Dr. Stachura called and ordered laboratory work. At 10:35 p.m., the nurses notified Dr. Love of L.P.'s inability to void in spite of the two liters of IV fluid she had just received. The nurses also notified Dr. Love of L.P.'s

---

[3] An ileus is a mechanical, dynamic, or adynamic obstruction of the bowel which may be accompanied by severe colicky pain, abdominal distention, vomiting, absence of passage of stool, and often fever and dehydration. An adynamic ileus is the obstruction of the bowel due to paralysis of the bowel wall, usually as a result of localized or generalized peritonitis or shock. *Stedman's Medical Dictionary* 849 (26th ed.1995).

temperature of 100.5, blood pressure of 80/42, pulse of 152, and respiratory rate of 38 on three (3) liters of oxygen.

At 11:00 p.m., L.P. vomited dark green fluid, she urinated only 30 cc of clear amber dark urine, her blood pressure decreased to 78/40, her respiratory rate was 40, and her pulse was 160. The nurses called Dr. Love immediately. At 11:45 p.m., Dr. Stachura ordered that an NG (nasogastric) tube be placed and that a third (1000 cc) bolus of IV fluid be started.

On March 23, 2000, at 1:15 a.m., L.P.'s blood pressure decreased to 60/50, her heart rate increased to 170 beats/minute, her temperature increased to 100.8, and her respiratory rate increased to 44. Moreover, in spite of being on oxygen, her oxygen saturation was only 88%. The nurses notified Dr. Love of L.P.'s condition, and he ordered another bolus of fluid. At 1:25 a.m., Dr. Stachura called about L.P.'s status and transferred her to the intensive care unit (ICU). At 1:30 a.m., L.P. had a blood pressure of 60/45, pulse of 172, respiratory rate of 40, and a temperature of 100.6. Prior to transferring L.P. to the ICU, the nurse noted L.P. was cool to touch, had slightly cyanotic skin, was anxious, and was having difficulty breathing. The nurse administered a dose of sodium bicarbonate prior to transferring L.P. to the ICU. The nurse noted that "patient was still in distress."

At 2:30 a.m., L.P. was admitted to the ICU. L.P.'s heart rate was 170 and her blood pressure had improved into the 90's. Dr. Stachura was paged. The nurse noted abdominal distension and a low oxygen saturation. Oxygen was administered and the oxygen saturations improved. The ICU nurse noted L.P. had only urinated 50 cc since 10:30 p.m. in spite of receiving 2500 cc of IV fluid. Dr. Stachura suspected a differential diagnosis of pulmonary embolus. At 3:00 a.m., Dr. Stachura ordered a VQ scan, a CT scan of the abdomen and pelvis with contrast. The VQ scan is used to assess whether there is an embolus in the lungs. The VQ scan did not

indicate the presence of an embolus but did suggest there was free air under the diaphragm. The CT scan indicated free air in the abdominal and pelvic cavity and a hematoma at the surgical site. The chest x-ray indicated L.P. had atelectases[4] and possibly infiltrates in the lower lobe of her left lung. A repeat CBC also indicated a decrease in the WBC, down to 2.3 with 7-10 being normal. The ICU nurse noted that L.P.'s urine output since 10:30 p.m. had only been 100 cc even though she had received 5000 cc of fluids.

At 6:15 a.m., L.P. returned from radiology. At that time, her blood pressure was in the low 70's and her heart rate remained at 170. Dr. Stachura was paged to ICU. At 6:45 a.m., Dr. Stachura ordered arterial blood gases. At 7:15 a.m., the nurse noted L.P. was anxious, her respiratory rate was in the high 40's, her abdomen was firm and distended, and she was grimacing. L.P. reported she had pain throughout her abdomen and felt like her "throat was closing up." The arterial blood gases showed a pH of 7.2. Her pressure of oxygen was only 68 and her bicarbonate concentration had not improved in spite of having received sodium bicarbonate. At 7:15 a.m. Dr. Stachura was STAT paged to ICU. At 7:30 a.m., Dr. Stachura answered the page and by 7:40 a.m. he was by L.P.'s bedside and obtained a consent for exploratory surgery. The nurses were unable to get a blood pressure on L.P. without the use of a doppler. The doppler systolic blood pressure was 60. Accordingly, dopamine was initiated. At 8:15 a.m., Dr. Urias, the anesthesiologist, intubated L.P. Her blood pressure remained at 60 in spite of the dopamine. Therefore, a stronger inotropic (influences the contractility of muscular tissue) medication was initiated. At 8:20 a.m., Dr. Arias placed a Swan-Gantz catheter to increase the ability to monitor L.P.'s condition and to ensure availability of IV central ports for administration of fluids and medications. The cardiac

---

[4] Atelectasis is absence of gas from a part or the whole of the lungs due to failure of expansion or resorption of gas from the alveoli. *Stedman's Medical Dictionary* 161-62 (26th ed. 1995).

4

output was 8.  Dr. Urias was unsuccessful in placing an arterial line but opted to take L.P. to the operating room without the availability of the arterial line.  At 8:40 am., L.P. was transferred to the operating room.

Dr. Stachura and Dr. Last, the assisting surgeon, performed a midline incision and dissected down to the fascia.  When they entered the peritoneum, they noted a large amount of greenish-brown liquid in the peritoneal cavity.  The surgeons obtained cultures and further opened the abdominal cavity.  They evacuated a large amount of fluid and inspected the abdomen.  They found the source of the leakage was in the sigmoid colon.  The surgeons attempted to oversew the site and explored the abdomen.  The operative notes suggest that L.P. was tachycardiac and her blood pressure was low throughout the case.  While the surgeons attempted to create a colostomy, L.P. had a cardiac arrest.  The arrest began at 10:55 a.m., and Dr. Last pronounced L.P. dead at 11:35 a.m.

On March 24, 2000, the Office of the Medical Investigator (OMI) performed an autopsy.  The autopsy indicated the peritoneum was diffusely erythematous.  The OMI found green-yellow purulent exudate with fibrinous adhesions covering the surface of multiple loops of the small bowel and focally involving the peritoneal cavity of the lateral left abdominal wall. The OMI also found purulent exudate involving the anterior surface of the liver.  The autopsy revealed acute peritonitis consistent with diffuse inflamation of the peritoneal cavity and pus covering the surface of the small and large bowel.  The examination of the resected section of colon revealed a "transmural defect with sharp margins consistent with a perforation due to a sharp force injury such as a surgical scalpel."

On March 23, 2000, Dr. Ramirez suspended Dr. Stachura.  Under MMCI's Medical Staff Bylaws (Bylaws), if a department chair perceives that a physician's actions present an immediate

danger to patients, he/she may take the interim measure of summarily suspending the physician's privileges upon notice to the practitioner. NB II, at 99. Dr. Ramirez reviewed L.P.'s chart and opined that Dr. Stachura had failed to timely recognize he had cut the sigmoid colon during the surgical procedure and therefore his performance did not comport with the standard of care. Dr. Ramirez also opined that Dr. Stachura failed to timely recognize the importance of L.P.'s sudden change which indicated sepsis.[5]

Under the Bylaws, Dr. Ramirez' decision to summarily suspend Dr. Stachura had to be reviewed by the Executive Committee no later than one business day to investigate the incident. NB II at 99. On March 24, 2000, the Executive Committee met to discuss Dr. Stachura's treatment of L.P. NB I at 256. The Bylaws require the Executive Committee "make a prompt, preliminary review of the circumstances surrounding a summary suspension, and should determine whether the suspension should be lifted, modified, or allowed to continue during further investigation and hearing procedures." NB II at 99. In this case, the Executive Committee approved Dr. Ramirez' decision to suspend Dr. Stachura, pending investigation. The Bylaws require the Executive Committee to "form a Special Investigative Committee (SIC) which may consist of its own members, Medical Staff members who are not on the Executive Committee, and, in part, may consist of Active Staff members of the appropriate Department." NB II at 100. The Executive Committee agreed that the members present also act as the SIC.

On April 3, 2000, the SIC met. The SIC discussed the fact that another physician was also involved in L.P.'s care and expressed its concern that the patient was not seen in a timely manner. The SIC interviewed the nurse who cared for L.P. on her first postoperative day. NB II at 259-60.

---

[5] Sepsis is the presence of various pus-forming and other pathogenic organisms, or their toxins, in the blood or tissues. *Stedman's Medical Dictionary* 1598 (26th ed. 1995).

The SIC met again on April 10, 2000. The SIC interviewed five nurses involved in L.P.'s care, Dr. Love and Dr. Stachura. After considering all the testimony and reviewing the events that led to L.P.'s death, the SIC (with Dr. Ramirez abstaining) made a motion to recommend to the Executive Committee that Dr. Stachura be reported to the New Mexico Board of Medical Examiners and continued his suspension until the Board of Directors met. The recommendation was made "in light of the pattern of previous complications as well as multiple serious deficits in judgment and conduct." The SIC also recommended Dr. Stachura's privileges be terminated. NB I at 261-273.

On April 11, 2000, the Executive Committee met and accepted the recommendations from the SIC.[6] Dr. Ramirez and another member abstained. NB I at 274. On April 13, 2000, MMCI's President and Chief Executive Officer (CEO) provided Dr. Stachura with a written notice of the Executive Committee's decision. NB I at 396-97. In this April 13, 2000 notice, the CEO informed Dr. Stachura of his right to review by a Special Judicial Review Panel (Panel) under the Bylaws and advised him of his right to request a hearing before the Panel within thirty (30) days of receipt of the notice. In the event that Dr. Stachura requested a hearing, he had the right to representation by an attorney, to have a record made of the proceedings, to call and cross-examine witnesses, to present evidence, to submit a written statement at the close of the hearing, to receive the written recommendation of the Panel and to subsequently receive the Board of Director's written decision, together with a statement of the basis for the decision. *Id.*

---

[6] Under the Bylaws, the Executive Committee must convene within three (3) business days after receiving the SIC report. Based upon the evidence obtained by the SIC's inquiry, the Executive Committee must either recommend that the Board of Directors take action or take no action. If the Executive Committee recommends the Board of Directors take an action, i.e., suspension, revocation of the Medical Staff member's clinical privileges, the recommendation must contain the reason for the recommended action and the Medical Staff member must be afforded the notice and hearing procedures. NB II at 101.

On May 3, 2000, Dr. Stachura requested a hearing before the Panel and asked for clarification of the basis of the proposed action. NB I at 398-99. On May 17, 2000, the CEO wrote to Dr. Stachura and provided him with the basis for his summary suspension, the March 23, 2000 death of the surgical patient and his pattern of previous complications and instances of deficient judgment. NB I at 400.

On July 12, 2000, counsel for MMCI wrote a letter to Dr. Stachura's counsel listing the witnesses he anticipated calling. NB II at 37. On August 17, 2000, a full trial-type hearing was conducted before the Panel. NB I at 1-73. On September 19, 2000, the Panel recommended to the Executive Committee no modifications of the Executive Committee's initial recommendation that MMCI permanently suspend Dr. Stachura's privileges. NB I at 413-17. On September 25, 2000, the Executive Committee accepted the Panel's recommendation. NB I at 416.

On September 28, 2000, MMCI's CEO wrote to Dr. Stachura's counsel informing him of the Panel's adverse ruling to his client and the Panel's decision to uphold the Executive Committee's original recommendation to terminate Dr. Stachuras' privileges at MMCI. As grounds for the Panel's decision, the CEO cited Dr. Stachura's delay in diagnosing L.P.'s condition as well as Dr. Stachura's general lack of skill in judgment. The Panel also noted that the case reviewed during the proceeding was not an isolated incident but a series of complications that had led to adverse patient outcomes. NB I at 418. The CEO also advised Dr. Stachura of his right to appeal the Executive Committee's decision to the Board of Directors within seven calendar days of receipt of the CEO's letter.

On October 9, 2000, Dr. Stachura exercised his right to appeal the Executive Committee's decision to the Board of Directors. On November 1, 2000, the parties attended an appellate hearing before the Board of Directors. On November 9, 2000, the parties received the Board of

Directors findings and conclusions, upholding the Executive Committee's recommendation and permanently suspending Dr. Stachura's privileges.

Subsequently, Dr. Stachura filed his Complaint for declaratory judgment, an appeal from an administrative review, for damages, attorney fees and costs. Dr. Stachura claims MMCI (1) denied him due process; (2) failed to follow its Bylaws; (3) failed to incorporate appropriate standards and procedures consistent with due process in its Bylaws; (4) acted under color of state law sufficient to invoke the application of his civil rights under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983; (5) breached the employment contract it had with him; (6) waived immunity for its actions; and (7) was arbitrary, capricious and unreasonable in revoking his privileges.

## II. Standard of Review

The parties have agreed to proceed upon written submissions and accept a bench trial standard of review. Under this standard, the credibility of witnesses, the weight to be given evidence, and the reasonable inferences to be drawn from the evidence fall within the province of the Court.

## III. Discussion

### A. State Action

In order to state a claim under § 1983, a plaintiff must show (1) deprivation of a right secured by the federal constitution or federal laws and (2) that the deprivation was caused by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Under § 1983, liability attaches only to conduct occurring "under color of law." *Gallagher v. Neil Young Freedom Concert,* 49 F.3d 1442, 1447 (10th Cir. 1995). "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or

wrongful." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999).   To prevail on a section 1983 claim of deprivation of constitutional rights, Dr. Stachura must show that his hospital privileges were terminated as a result of state action.  Dr. Stachura contends MMCI and its Board of Directors are state actors.

In *Gallagher*, the Tenth Circuit set forth the four tests the Supreme Court has applied to determine whether state action exists.  These tests are the close nexus test, the symbiotic relation test, the public function test, and the joint participation test.  *Gallagher*, 49 F.3d at 1447.  The Tenth Circuit made clear that "[u]nder each of these four tests, 'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'"  *Id.* (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982)).  Therefore, "[i]n order to establish state action a plaintiff must demonstrate that the alleged deprivation of constitutional rights was 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.'"  *Id.*  Additionally, "the party charged with the deprivation must be a person who may fairly be said to be a state actor."  *Id.*  In *Gallagher*, the Tenth Circuit reiterated the general principles established by the Supreme Court when applying the various tests.

> First, the existence of governmental regulations, standing alone, does not provide the required nexus.  Similarly, the fact that a private entity contracts with the government or receives governmental funds or other kinds of governmental assistance does not automatically transform the conduct of that entity into state action.  Finally, under the nexus test, "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment."

*Gallagher*, 49 F.3d at 1148 (internal citations omitted). Finally, the Court recognizes that in determining whether a particular conduct constitutes state action the Court engages in a "necessarily fact-bound inquiry." *Lugar*, 457 U.S. at 939.

## 1. Close Nexus Test

Under this test, "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 295 (2001)(quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974)). A challenged action may be state action when it results from the State's exercise of "coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Therefore, the State will be held liable for constitutional violations only if it is responsible for the specific conduct of which the plaintiff complains. *Gallagher*, 49 F.3d at 1448.

Dr. Stachura contends that in this case there is "significant coercion or encouragement at least" to establish the requisite nexus and relies on the following factors to support his contention: (1) the makeup of the governmental entity (Memorial Medical Center) did not change upon incorporation;[7] (2) the governmental entity's mission did not change upon incorporation;[8] and (3)

---

[7] In support of this assertion, Dr. Stachura relies on the following: (1) When MMCI incorporated, the Board of Directors for Memorial Medical Center (MMC) (the governmental entity)remained as MMCI's Board of Directors; (2)MMCI kept MMC's Chief Executive Officer; and(3) MMCI kept the same employees and the same assets as MMC. Additionally, Dr. Stachura relies on the following matters which he claims the City and the County have never been involved in whether the hospital was a governmental entity or a private entity: (1) Both MMC and MMCI have been responsible for obtaining and maintaining all licenses necessary to operate the hospital, have applied for and received authorization from Medicare, Medicaid, Champus and other

the credits granted by the government for MMCI's rent "significantly increased the manner in

which the hospital became the alter ego for the government's traditional public function."[9] Pl.'s

Trial Br. at 23.

---

federal and state programs, have been responsible for credentialing and privileging of its medical staff, and have employed all of their staff and sponsored their benefit programs.

[8] Dr. Stachura relies on the Hospital Operating Lease between MMCI, the City, the County, New Mexico State University and MMC to support this assertion. Relying on language from the Lease, Dr. Stachura contends MMCI fulfills MMC's public purpose of "maintenance of a high quality general acute care hospital to provide quality healthcare delivery . . . for the people of the City, County, and surrounding areas." See Hospital Operating Lease, NB III, at 124, para. C.

[9] In support of this assertion, Dr. Stachura relies on the following factors: (1) MMCI pays rent in the amount of $7,119,000.00 per annum to the City, the County and MMC; (2) MMCI assumed the existing bond obligations of MMC in 1998 which were approximately $40,000,000.00; (3) MMCI directly pays the debt service on the loans to MMC of the existing bonds and existing bond agreements and will receive a credit against the rent due to the governmental entities; (4) if the cost of care for the medically indigent residents of Dona Ana County exceed the total per annum rent obligation of MMCI, then the sole burden of that cost will be on MMCI and neither the City nor the County shall have any obligation to pay or reimburse MMC; (5) the total cost of care provided by MMCI to the medically indigent residents of Dona Ana County exceeding the total per annum rent payable under the lease will be considered a credit against MMCI's rental obligation for the succeeding year only; (6) a reserve against contingencies has been established by the creation of an escrow account managed by an independent corporate fiduciary acceptable to MMCI, the City and the County in which there is deposited the aggregate sum of $6,300,000.00 in thirty-six equal monthly installments. The corpus of the escrow is invested in Allowed Investment Instruments as specified by the City of Las Cruces Investment Policy with the annual income of the corpus to be paid one half to the City and the County as additional rent throughout the term of the lease and upon termination the corpus reverts to MMCI; MMCI has access to the corpus only if it obtains advance written consent from the City and the County and only for the purpose of meeting an emergency contingency. See Hospital Operating Lease, NB III at 134-136.

The challenged action, which Dr. Stachura contends constitutes state action, is MMCI's termination of his hospital privileges. Thus, Dr. Stachura must show that the City or County "exercised coercive power" or provided "significant encouragement" with respect to MMCI's decision to terminate his hospital privileges. *Gallagher*, 49 F.3d at 1448.

In this case, MMCI, is a private non-profit corporation and not a political subdivision or agency of the government. NB III at 211. MMCI's "policy making and governing powers" are "vested in the Board of Directors." NB III at 220-222. The Board of Directors is comprised of seven solely private citizens. *Id.* The Board is selected through a Nominating Committee comprised of nine private citizens. *Id.* The City and County each select two members to the Nominating Committee. *Id.* However, no public official or employees of the City or County may serve on the Board of Directors or the Nominating Committee. *Id.* Neither the City nor the County has the power to select members to the Board of Directors. *Id.* Absent a material and uncured breach of the Hospital Operating Lease, the City and the County do not have authority to replace Board members and, in fact, have never replaced any MMCI Board members. *Id.* Notably, the City and the County have no role in the actual day-to-day operation of MMCI. *Id.* MMCI's President/CEO manages the day-to-day operations and is not accountable to the City or the County. NB III at 22, 97. Moreover, the City and County have absolutely no role in MMCI's peer review process. NB III at 97. MMCI has complete discretion over peer review and personnel matters within the hospital. NB III at 140.

The factors Dr. Stachura relies on to show state action do not establish a sufficient nexus to demonstrate state action. The fact that MMCI does not pay taxes does not support Dr. Stachura's position. MMCI does not have to pay taxes because it incorporated under § 501(c)(3) as a non-

profit corporation. Non-profit corporations are not required to pay taxes. MMCI's obligation to make certain financial records available to the City and County does not help Dr. Stachura. The County and City, as MMCI's landlord have an obligation under the Hospital Operating Lease to disclose certain financial records so that the City and County may apprise themselves of MMCI's financial viability and in order to ensure the lease is being fulfilled. Finally, MMCI's funding also does not support Stachura's position. As a community sole source hospital, MMCI receives funding from the County and matching federal funds. By statute, the County is required to provide reimbursement for the care of the County's medically indigent. NB III at 56. When a hospital, private or public, is deemed a sole community facility it receives matching funding from the federal government. *Id.* Thus, receiving this funding from the County does not necessarily transform MMCI's decision to terminate Dr. Stachura's hospital privileges acts of the State. *See e.g. Blum v. Yaretsky*, 457 U.S. at 1011 (substantial governmental subsidies to nursing homes did not transform challenged action into State action). Thus, none of the factors Dr. Stachura has asserted demonstrate that the City or County were responsible for the decision to terminate his hospital privileges.

## 2. Symbiotic Relationship

Under the symbiotic relationship test, state action is present if the state "has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged action." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961). In *Burton*, the state leased space to a private restaurant that refused to serve an African-American customer. The restaurant received tax benefits, convenient parking for its customers and public funds were used for building maintenance. The restaurant was "a

physically and financially integral and, indeed, indispensable part of the State's plan to operate its project as a self-sustaining unit." *Id.* at 723-24. Therefore, "the state's leasing of space to the restaurant conferred a variety of mutual benefits on each party." *Gallagher*, 49 F.3d at 1451. The Court found that "profits earned by discrimination not only contribute[d] to, but also [were] indispensable elements in, the financial success of a governmental agency." *Id.* at 724. Having found that the State profited from the restaurant's discriminatory conduct, the Court thus held that the privately owned restaurant's refusal to serve an African-American customer constituted state action.

Dr. Stachura contends the Hospital Operating Lease demonstrates the "interdependence" contemplated by the symbiotic relationship test because the City, County and MMCI all benefit from the lease. Plaintiff's Trial Brief at 18. In support of his assertion, Dr. Stachura lists the following mutual benefits: (1) the government continues to fulfill its public purpose of providing free services to medically indigent residents of Doña Ana County; (2) the transition from a governmental entity to a private entity did not require any changes in assets, staff, or capital; (3) MMCI assumed the government's existing bond obligations; (4) the government determines how MMCI classifies the unpaid services to the medically indigent through the Hospital Community Benefit Policy; (5) the Medical Center Contingency Escrow of approximately six million dollars secures MMCI's financial stability and serves as a reserve against contingencies; (5) the government retains control through prior written approval of any change in the selection of MMCI's directors, plan of merger and has the power to remove the majority of directors in case of a material default; (6) the government has the right to dissolve MMCI or transfer all of its assets and liabilities to another entity; (7) MMCI's assets cannot be encumbered, demolished or sold

without consent from the government; (8) the government remains a named insured under all insurance policies, even workers' compensation; (9) the government annually receives and inspects financial documents from MMCI; (10) the net rent payable to the government will continue to be used solely for the delivery of healthcare to the citizens of the City and County; and (11) the government has a substantial influence in nominating new Board of Directors because four of the nine-member nominating committee are appointees of the government. NB III at 132-146.

Although these factors support Dr. Stachura's contention that the parties all benefits from the Hospital Operating Lease, Dr. Stachura has failed to demonstrate how the City or County benefitted from MMCI's decision to terminate his hospital privileges. Moreover, Dr. Stachura has not shown that the Hospital Operating Lease is an indispensable element in the governmental entities' financial success. *See Gallagher*, 49 F.3d at 1453. Accordingly, Dr. Stachura has not satisfied the symbiotic relationship test.

### 3. Joint Action

Under the joint action test, state action is present if a private party is a "'willful participant in joint action with the State or its agents.'" *Gallagher*, 49 F.3d at 1453 (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980). This test focuses on "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Id.* "Under this approach, state and private entities must share a specific goal to violate the plaintiff's constitutional rights by engaging in a particular course of action." *Id.* at 1455.

To satisfy the joint action test, Dr. Stachura alleges the following factors: (1) MMCI invoked the assistance of the City and County to skirt the state and federal regulatory restrictions

such as the anti-donation clause and the prohibition against private competition by public bodies by creating an alter ego of the previous governmental entity; and (2) the government was able to avoid fulfilling its public duty to the indigents by structuring the lease in a manner that delegates the duty to MMCI. Pl.'s Trial Br. in Supp. of Pl.'s Position at 23. According to Dr. Stachura, these factors show that MMCI "provides the type and amount of services to the county which are sufficient to invoke a claim of state action." *Id.*

The Court disagrees. These factors do not establish that the City and County acted in concert with MMCI in terminating Dr. Stachura's hospital privileges. Dr. Stachura has not presented any evidence to show that the City or County participated, influenced or were even aware of MMCI's decision to terminate his hospital privileges. The law is clear that the presence of governmental contracts, significant public funding, or government regulation, either alone or together, are insufficient to convert private action into state action. *See e.g. Blum v. Yaretsky*, 457 U.S. 991 (1982)(extensive State funding and extensive State regulation did not convert decision by private nursing homes to transfer patients into State action); *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982)(nonprofit, privately operated school's receipt of public funds did not make its decision to discharge plaintiffs State action).

**4. Public Function**

Finally, Dr. Stachura contends MMCI is a state actor because it performs a "public function." Under the public function test when the State delegates to a private party a function "traditionally exclusively reserved to the State" then that private party is necessarily a state actor. *Jackson,* 419 U.S. at 352. However, "[t]hat a private entity performs a function which serves the

17

public does not make its acts state action." *Rendell-Baker*, 457 U.S. at 842. The public function

must have been "exclusively reserved to the State." *Jackson*, 419 U.S. at 356.

Dr. Stachura contends this case meets the public function test because "the government in

this case has essentially delegated the provision of indigent medical care, a traditional public

function by its own admission, to MMCI through the lease covenant to maintain the 'public

service' and 'public mission.'" Trial Br. in Supp. of Pl.'s Position at 22. However, private

hospitals have existed in New Mexico since 1907 and have provided indigent care. NB III at 264.

Accordingly, Dr. Stachura has failed to show that MMCI is performing a function "traditionally

exclusively reserved to the State." *Jackson,* 419 U.S. at 352.

For the foregoing reasons, the Court find that Dr. Stachura has not stated a claim for relief

under 42 U.S.C. § 1983. Alternatively, even if the Court had found that MMCI was a state actor,

MMCI provided Dr. Stachura with due process of law.

**B.  Due Process of Law**

"The requirements of procedural due process apply only to the deprivation of interests

encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of

Regents v. Roth*, 408 U.S. 564, 569 (1972). Thus, in order to invoke the protections of procedural

due process, a plaintiff must first establish the existence of a recognized property or liberty

interest. Once a person establishes a protected interest, "he must be afforded opportunity for some

kind of hearing." *Id.* at 570 n.7; *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542

(1985)(holding that it is an "essential principle of due process that a deprivation of property be

preceded by notice and opportunity for hearing appropriate to the nature of the case")(citation,

alterations, and internal quotation marks omitted).  The importance of the protected interests involved determine "the formality and procedural requisites for the hearing." *Roth,* at 571 n.8.

"In order to have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it."  *Id.* at 577.  A person must have a legitimate claim of entitlement to it.  *Id.*  Moreover, property interests are not created by the Constitution; they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.  *Id* at 577.

In this case, Defendant contends Dr. Stachura "fail[ed]to advance any case law or argument that the Bylaws provide him with a property right protected under the due process clause."  Def.'s Tr. Resp. Br. at 6.  Assuming, without deciding, that Dr. Stachura has a recognized property interest in hospital staff privileges, nonetheless, the Court finds that MMCI provided Dr. Stachura with due process.  *See e.g., Setliff v. Memorial Hosp. of Sheridan County*, 850 F.2d 1384, 1395 (10th Cir. 1988)("In sum, while Setliff may have a property interest in his medical privileges, . . . those privileges were in no way restricted or modified until after he received a hearing before the Board of Trustees), *but see*, *PFenninger v. Exempla, Inc.*, 116 F.Supp.2d 1184, 1195 (D.Colo. 2000)("While Dr. Pfenninger was clearly entitled to numerous procedural protections before removal of his [hospital staff] privileges, it is well established that procedural protections alone do not create a protected property right . . . . Plaintiffs have failed to satisfy their burden of demonstrating the existence of a constitutionally-protected property right . . . .").

In this case, MMCI complied with the procedures set out by the Bylaw when MMCI terminated Dr. Stachura's hospital privileges.  Pursuant to the Bylaws,  Dr. Ramirez summarily suspended Dr. Stachura after notifying Dr. Stachura of this intended action.   NB I at 395.  Dr.

Stachura does not dispute Dr. Ramirez notified him of the summary suspension or failed to comply

with the summary suspension provisions.  Dr. Stachura contends his procedural due process was

violated at this step because "Dr. Ramirez' letter which summarily suspended [him] did not make

reference to the CBDs."[10]  Tr. Br. in Supp. of Pl.'s Position at 25.  However, Dr. Ramirez

testified  it was L.P.'s death that prompted him to summarily suspend Dr. Stachura.  NB I at 29-31.

Dr. Ramirez, as the Chair for the Department of Surgery, also was aware of other problems Dr.

Stachura had while at MMCI.  NB I at 32-34.  Dr. Ramirez further testified he had been aware of

Dr. Stachura's "pattern of poor clinical judgment."  *Id*. at 32.  At the summary suspension level,

---

[10] On March 5, 1998, the Chairman of the Department of Surgery
informed the President, Medical Staff of Memorial Medical Center of
his concern regarding Dr. Stachura's competency.  NB II at 1. The
Chairman requested a formal review as directed by the Bylaws.  *Id.* As
grounds for his request, the Chairman presented the case of a twenty-
two year old pregnant patient on whom Dr. Stachura had performed a
laparoscopic cholecystectomy and suffered a ligation of the common
bile duct.  Subsequently, the patient had to be transferred to
University Hospital for further complicated surgical procedures.  *Id.*
The Chairman specifically informed the President this was not a one-
time occurrence for Dr. Stachura and other incidences of bile duct
injuries had occurred.  *Id.*

On March 10, 1998, a Special Investigative Committee held a
meeting pursuant to the New Mexico Review Organization Immunity Act.
Dr. Ramirez was a member of this committee, along with five other
physicians, including the Chairman of the Department of Surgery. The
committee was formed at the request of the Executive Committee to
review Dr. Stachura's history of having had "three ligated common
bile ducts since 1994." NB II at 3-4.  Besides discussing the three
ligated common bile cases, the committee also discussed other cases
involving cholecyctomies. *Id.* at 4.  The committee unanimously agreed
that Dr. Stachura obtain further education and take a leave of
absence for one year to obtain training.  *Id.* at 4. On March 10,
1998, by letter, the Chairman of the Special Investigative Committee
informed the President of the Executive Committee about their
recommendation and requested Dr. Stachura act on it immediately.  NB
II at 5. If Dr. Stachura failed to follow the recommendation, he
would be summarily suspended. *Id.*  Dr. Stachura accepted the Special
Investigative Committee's recommendation and took a leave of absence
from Memorial Medical Center and received additional surgical
training at UNM School of Medicine.  NB II at 6.

the Bylaws only require that Dr. Stachura be "notified verbally and, subsequently in writing at the first opportunity, by the person taking the emergency measure of the summary suspension." NB II at 99. Dr. Ramirez complied with this provision.

Additionally, Dr. Stachura contends the notice from the President of MMCI "advising [him] of the decision of the (Medical) Executive Committee's decision did not follow the by-laws in that it did not set out the 'basis for the proposed action . . . with sufficient specificity to advise the Medical Staff member of the nature and concern and to give the member an opportunity to review the incident in question.'" Tr. Br. in Supp. of Pl.'s Position at 25. Specifically, Dr. Stachura contends the notice did not specify the prior CBDs. In a letter dated April 13, 2000, MMCI's President advised Dr. Stachura of the Executive Committee's decision to suspend his hospital privileges. NB I at 396-397. The President failed to set out the basis for the proposed action. However, in a letter dated May 3, 2000, Dr. Stachura's counsel requested the basis of the proposed action from MMCI's President. NB I at 398-399. On May 17, 2000, MMCI's President provided Dr. Stachura the basis for the action taken with respect to his hospital privileges. NB I at 400. Specifically, the President informed Dr. Stachura that the action taken by the Chairman of the Department of Surgery to summarily suspend his hospital privileges was "because of an incident involving the death of a surgical patient." *Id.* The President also informed Dr. Stachura that the action taken by the Executive Committee "to continue the summary suspension and recommend permanent revocation of [his] privileges [was] based on its review of the referenced incident, a pattern of previous complications, and instances of deficient judgment." *Id.* This notice comports with due process. A pattern of previous complications would certainly encompass the prior CBDs.

Dr. Stachura also argues his due process rights were violated because "the prior incidents relating to him were improperly interjected into the proceedings without proper notice, without an opportunity to examine potential witnesses, and without any relevant basis." Tr. Br. in Supp. of Pl.'s Position at 25. Dr. Stachura further contends the minutes of the Special Investigative Committee for the CBDs incidents were not made available until the day of the hearing and then the names of all participants and witnesses had been redacted and thus there was no opportunity to cross-examine. *Id.* Dr. Stachura also contends the evidence regarding the CBDs was far removed and not relevant to L.P.'s surgery. Finally, Dr. Stachura contends that the fact that he was no longer eligible for hospital privileges because he was not board eligible was not a basis for the summary suspension yet this fact was allowed into the proceeding hence he was denied due process. *Id.* at 26.

The Court finds that, although L.P.'s death was the incident that triggered the process resulting in MMCI terminating Dr. Stachura's hospital privileges, the decision was not made in a vacuum. The evidence concerning the prior CBDs was relevant to Dr. Stachura's competency and not so far removed as to deprive Dr. Stachura of due process. If Dr. Stachura desired to cross-examine the individuals that brought this complaint against him, the time to do so was during the March 10, 1998 proceedings. Had Dr. Stachura challenged the Special Investigative Committee's recommendation to the Executive Committee, he would have been summarily suspended. NB II at 5. This would have triggered the process set forth in the Bylaws and Dr. Stachura would have had the opportunity to cross-examine his accusers. By accepting the Special Investigative Committee's recommendation, which the Executive Committee adopted, Dr. Stachura waived his right to collaterally challenge that proceeding at this point. NB I at 394.

Dr. Stachura's contention that he was denied due process because "the issue of board certification" was "allowed as a basis for the revocation of his privileges" has no merit. Tr. Br. in Supp. of Pl.'s Position at 26. MMCI requires its surgeons be board certified or board eligible.[11] NB. II at 32. Sometime before the death of L.P., Dr. Ramirez, as Chair of the Department of Surgery, inquired into Dr. Stachura's status in obtaining his board certification. Dr. Stachura informed Dr. Ramirez he had failed the written examination again. *Id.* At this point, Dr. Ramirez turned the matter over to the Chief of Staff and the Credentialing Committee to determine his status as to his hospital privileges. *Id.* The fact that Dr. Stachura was no longer board eligible was relevant to the proceedings because the written examination tested his general knowledge of surgery and went to his competency. Additionally, even if the Executive Committee had notified Dr. Stachura that this was going to be a basis for termination of his hospital privileges he has not presented any evidence that he would have provided a different defense to the undisputed fact that he was no longer board eligible. Accordingly, because evidence concerning board certification did not prejudice Dr. Stachura's ability to defend himself at the Panel hearing, this claim does not support a due process violation.

---

[11] According to Dr. Ramirez' deposition testimony, to become a board certified surgeon, a physician has to complete an accredited surgical residency. After the physician completes the surgical residency, the physician must take a written, qualifying examination by the American Board of Surgery. The examination tests a physician's general knowledge of surgery. A physician has five years to successfully pass the qualifying examination. If a physician does not pass the examination within the five year period, the physician is no longer board eligible. If the physician passes the written examination, then he takes oral examinations which consist of three sessions with a "surgeon at large." Each surgeon tests the physician's clinical competence. NB II at 32.

Dr. Stachura also takes issue with the fact that "all the materials, records and charts presented by MMCI had the names of witness[es] redacted" and claims this "deprived him of an opportunity to cross-examine witnesses." Tr. Br. in Supp. of Pl.'s Position at 26. Specifically, Dr. Stachura contends he was not provided with the names of the members of the Special Investigative Committe or the Executive Committee since the names of the members of the Executive Committee and the Special Investigative Committee had been redacted. *Id.* Moreover, Dr. Stachura contends he did not know until the Panel hearing that Dr. Ramirez had been on both the Executive Committee and the Special Investigative Committee. Therefore, Dr. Stachura contends he "was denied the opportunity to prepare adequately and to examine all potential witnesses (other members of the Executive Committee.)" Tr. Br. in Supp. of Pl.'s Position at 26-27.

On August 4, 2000, counsel for MMCI provided Dr. Stachura with a summary of the testimony of Drs. Ramirez, Allen, Last, Love and Urias. NB I at 406. Additionally, Dr. Stachura was informed the nurses that attended L.P. while at MMCI would testify as to the care they provided to L.P. and their interaction with Dr. Stachura. *Id.* Counsel for MMCI also provided a list of witnesses and their telephone numbers to Dr. Stachura. *Id.* Dr. Stachura does not indicate how knowing the names of the members of the Special Investigative Committee or the Executive Committee would have assisted his defense or how he was prejudiced.

Dr. Stachura also contends the Panel failed to make findings of fact as required by the Bylaws.[12] Specifically, Dr. Stachura contends the Panel "only issued a half page 'memo' despite

---

[12] The Bylaws require the following from the Panel:

1. Within fourteen (14) calendar days of the completion of the hearing, the Special Judicial Review Panel will submit a written report to the President of the Medical Staff.

2. The report will include an assessment of the previous adverse

approximately 200 pages of testimony. Tr. Br. in Supp. of Pl.'s Position at 27. The Court finds

that the Panel's written recommendation complied with the Bylaws. The Panel assessed the

previous recommendation of the Executive Committee and recommended no modification in the

Executive Committee's initial adverse recommendation. NB I at 413. The Panel supported its

recommendation on the following facts: (1) there was a delay in diagnosis; (2) the physician was

lacking skills in judgment; and (3) this was not an isolated incident, but a series of complications

that had led to adverse outcomes. *Id.* "[I]n light of the pattern of previous complications as well

as multiple serious deficits in judgment," the Panel recommended the following to the Executive

Committee: (1) the physician should be reported to the NM Board of Medical Examiners; (2)

continue suspension until the Board of Directors met; and (3) terminate the privileges at Memorial

Medical Center. *Id.* Although, the Panel did not provide Dr. Stachura with detailed findings of

fact, the Panel substantially complied with the Bylaws.

     Next Dr. Stachura contends the Bylaws are unconstitutional because the Board of Directors

reviews the decision of the Executive Committee instead of the Panel's decision. Dr. Stachura

argues that because the Executive Committee meets in closed private session he was not given the

opportunity to participate at all stages of the peer review process. Dr. Stachura does not dispute

that he had a trial-type hearing before the Panel or that the Panel reached the same decision as the

Executive Committee. Dr. Stachura does not present any evidence to show the outcome of the

---

recommendation of the Executive Committee.

    a.  The assessment will include either a recommendation for no modification, for some modification, or revision in Executive Committee's previous adverse recommendation.

3. The report of the Special Judicial Review Panel will contain a statement of the facts found, the conclusions reached, and a statement of why its recommendation is warranted. NB II at 104.

proceedings would have been different had the Board of Directors reviewed the Panel's decision instead of the Executive Committee's decision. Moreover, due process does not require that Dr. Stachura participate at all stages of the peer review process.

Finally, Dr. Stachura contends MMCI violated his due process by allowing Dr. Ramirez, a direct economic competitor, to be a member of the Executive Committee and the Special Investigative Committee and by allowing Dr. Ramirez to testify on behalf of MMCI at the Panel hearing. Dr. Stachura relies on the Bylaws to argue that his due process rights were violated when Dr. Ramirez, his direct economic competitor, was involved in his investigation. The Bylaws state "The Special Investigative Committee should not contain partners, associates or direct economic competitors of the Medical Staff member, as determined by the Executive Committee." NB II at 100.

"A fundamental principle of procedural due process is a hearing before an impartial tribunal." *Tonkovich v. Kansas Board of Regents*, 159 F.3d 504, 518 (10th Cir. 1998). "However, 'a substantial showing of personal bias is required to disqualify a hearing officer or tribunal in order to obtain a ruling that a hearing is unfair.'" *Id.* (quoting *Corstvet v. Boger*, 757 F.2d 223, 229 (10th Cir. 1985)). Moreover, "[b]ecause honesty and integrity are presumed on the part of a tribunal, there must be some substantial countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being adjudicated." *Id.* (quoting *Mangels v. Pena*, 789 F.2d 836, 833 (10th Cir. 1986)).

Although it may have been preferable not to have Dr. Ramirez serve on the Special Investigative Committee, the Bylaws do not mandate that a direct economic competitor not be on the Special Investigative Committee. The word "should" allows for some discretion. Moreover,

Dr. Stachura has not presented any evidence to show that Dr. Ramirez was biased against him. Dr. Ramirez testified at the Panel hearing that he found Dr. Stachura "to be a very pleasant individual, a very courteous and friendly individual." NB I at 34. In addition, Dr. Ramirez testified he acted out of concern for patient safety. *Id.* Significantly, Dr. Ramirez abstained from voting as a member of the Executive Committee and the Special Investigative Committee. Finally, Dr. Allan, a member of the Special Investigative Committee testified at the Panel hearing that Dr. Ramirez did not actively participate in the questioning of witnesses. NB I at 45. Dr. Allan testified Dr. Ramirez provided guidance to the other committee member as to "what would be expected of a surgeon in this situation and how a surgeon's thought process should function in assessing a patient in this situation." *Id.* Notably, Dr. Allan testified the Special Investigative Committee "reached their own conclusions based on what they heard from the witnesses and their review of the chart" and "[did not] think Dr. Ramirez attempted to influence the process and to bring it to a certain conclusion." *Id.* Based on the evidence, the Court finds that Dr. Stachura has not shown Dr. Ramirez was biased against him.

Based on the foregoing, the Court finds that MMCI afforded Dr. Stachura all the due process appropriate in this case and complied with the Bylaws which are constitutionally firm.

## C. Health Care Quality Improvement Act Immunity

"Congress passed the Health Care Quality Improvement Act (HCQIA) 'to improve the quality of medical care by encouraging physicians to identify and discipline physicians who are incompetent or who engage is unprofessional behavior.'" *Mathews v. Lancaster Gen. Hosp.,* 87 F.3d 624, 632 (3d Cir. 1996)(quoting H.R.Rep. No. 903, 99th Cong., 2d Sess. 2 (1986)). The purpose was to identify incompetent physicians through "effective professional peer review,"

which it chose to encourage "by granting limited immunity [13] from suits for money damages to

participants in professional peer review actions." *Id. (*citing 42 U.S.C. §§ 11101(5), 11111(a)).

Congress also sought "to restrict the ability of incompetent physicians to move from State to State

without disclosure or discovery of the physician's previous damaging or incompetent

performance" by creating an obligation to report professional review sanctions to the Secretary of

the Department of Health and Human Services. 42 U.S.C. §§ 11101(2), 11134.

The standards that a professional review action must satisfy in order to entitle participants

in the review process to immunity are set forth in 42 U.S.C. § 11112(a)[14] and include certain

---

[13] The immunity provisions of the HCQIA, 42 U.S.C. § 11111, provides:

(a) In general

    (1) Limitations on damages for professional review actions
    If a professional review action (as defined in section 11151(9) of this title) of a professional review body meets all the standards specified in section 11112(a) of this title,except as provided in subsection (b) of this section-
    (A)  the profession review body,
    (B)  any person acting as a member or staff to the body,
    (C)  any person under a contract or other formal agreement with the body, and
    (D)  any person who participates with or assists the body with respect to the action,
shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action.

[14] Section 11112(a) provides:

(a) In general

    For purposes of the protection set forth in section 11111(a) if this title, a professional review action must be taken-
    (1)  in the reasonable belief that the action was in furtherance of quality health care,
    (2)  after a reasonable effort to obtain the facts of the matter,
    (3)  after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

fairness and due process requirements.[15]  For immunity to attach, the results of the action must be

reported to the State Board of Medical Examiners in compliance with 42 U.S.C. § 11133.

Pursuant to Section 11112(a), the HCQIA includes a presumption that a professional

review activity meets the standards for immunity, "unless the presumption is rebutted by a

preponderance of the evidence."  42 U.S.C. § 11112(a).  The plaintiff bears the burden of proving

that the peer review process was not reasonable.  *Bryan v. James E. Holmes Regional Medical*

*Ctr.*, 33 F.3d 1318, 1333 (11th Cir. 1994).  Moreover, "HCQIA immunity is a question of law for

the court to decide and may be resolved whenever the record in a particular case becomes

sufficiently developed.  *Id.* at 1332.

In this case, Dr. Stachura contends MMCI's belief that the action taken against him

furthered quality health care was not reasonable.  Dr. Stachura contends the belief was not

reasonable because "it relied solely on the judgment of Dr. Ramirez, the only surgeon on the

Committee, the physician who suspended Plaintiff and requested the SIC, the same physician who

---

```
     (4)   in the reasonable belief that the action was warranted by
           the facts known after such reasonable effort to obtain
           facts and after meeting the requirement of paragraph (3).

     A professional review action shall be presumed  to have met the
     preceding standards necessary for  the protection set out in
     section  11111(a) of  this title  unless the  presumption  is
     rebutted by a preponderance of the evidence.

42 U.S.C. § 11112(a).
```

```
     15 The due process requirements a professional review action must
meet to entitle participants to immunity include "adequate notice and
hearing procedures . . . afforded to the physician involved or . . .
such  other  procedure  as  are  fair  to  the  physician  under  the
circumstances.   42 U.S.C. § 11112(a)(3).   The HCQIA's due process
requirements  can  always  be  met  by  compliance  with  42 U.S.C. §
11112(b) which outlines notice and hearing requirements.
```

had predetermined the Plaintiff's judgment and skills based on three CBDs which were done two years before, and the same doctor who was an economic competitor of Plaintiff." Tr. Br. in Supp. of Pl.'s Position at 30. Dr. Stachura also contends the Panel "made no effort to obtain an outside review" and "instead relied on the guidance of a doctor (Dr. Ramirez) who had already predetermined that there was a problem with Plaintiff's judgment and skills." *Id.* Finally, Dr. Stachura contends he did not receive adequate notice and hearing procedures. *Id.*

The Court has already rejected these arguments and finds that MMCI complied with the provisions outlined in Section 11112(a) of the HCQIA and is therefore entitled to immunity. The Court further finds that MMCI acted in reasonable belief it was furthering quality health care. MMCI presented subtantial evidence regarding Dr. Stachura's competence. Specifically, MMCI presented evidence that Dr. Stachura had demonstrated a lack of clinical judgment in recognizing common bile duct injury that occurred to a patient during laparoscopic cholecystectomy. In this case, it took more than one admission before Dr. Stachura diagnosed the problem. In another instance, Dr. Stachura failed to diagnose a perforated ulcer. Dr. Stachura also had multiple CBD injuries.

## D.  Breach of Contract

Dr. Stachura contends the MMCI's Bylaws constitute an implied contract. On the other hand, MMCI argues that MMCI's Bylaws do not create an enforceable contract. Dr. Stachura claims the New Mexico Court of Appeals ruled in *Kelly v. St. Vincent Hospital*, 102 N.M. 201 (Ct.App. 1984) and *Clough v. Adventist Health Systems, Inc.*, 108 N.M. 801 (1989) that hospital bylaws constitute an implied contract. A close reading of these cases do not support such a holding. In *Kelly*, the hospital terminated the physician's hospital privileges for failure to comply

with the hospital's policy requiring all doctors to carry malpractice insurance. The physician

brought an action against the hospital and its board members, alleging that the adoption of the

policy requiring malpractice insurance maliciously interfered with his contractual relations with

his patients. There is no language in *Kelly* that the New Mexico Court of Appeals considered a

contract of any type between the hospital and the doctor. In *Clough*, the New Mexico Supreme

Court noted

> Dr. Clough maintains defendants' termination of his hip-pinning privileges, the
> termination of his hospital privileges, and the failure to afford proper remedial
> procedures in a timely manner violated the procedures in the bylaws, thus
> constituting a cognizable claim under New Mexico law for breach of his
> employment contract. On May 25, 1982, Dr. Clough received a copy of the
> medical staff bylaws. Defendants submitted copies of the hospital and medical
> bylaws in evidence, and **assumed arguendo** in their brief supporting summary
> judgment that these bylaws constituted an implied contract. It appears that the trial
> court found that an implied contract existed and then that no genuine issues of fact
> exist as to breach of contract.

*Clough*, 108 N.M. at 806 (emphasis added). The trial court granted Defendants' summary

judgment motion. The New Mexico Supreme Court did not specifically address the trial court's

finding that an implied contract existed.

Nevertheless, because the Court has already determined that MMCI complied with its

Bylaws, the Court finds it unnecessary to rule on the issue of whether hospital bylaws create an

implied contract between a physician and a hospital.

**E.  Appeal from Administrative Review**

In his Complaint, Dr. Stachura requests an "appeal from an administrative review" and

requests the Court "vacate the actions of the Defendants in terminating his privileges." MMCI

contends its final determination is not subject to any direct appeal. MMCI argues "its decision is

not germane to due process analysis, contract analysis, HCQIA immunity, or any cause of action in this suit." Defs.' Tr. Resp. Br. at 7.

In *Kelly*, the New Mexico Court of Appeals recognized a common law theory of judicial review of staffing decisions made by the board of a private non-profit hospital. *Kelly*, 102 N.M. at 201. However, the Court held that it would "review, under very limited circumstances, decisions made by a private hospital board." *Id.* The Court of Appeals did not explain what circumstances would warrant a review of a private hospital board's decision. Nonetheless, without deciding if MMCI's decision to terminate Dr. Stachura's privileges is subject to judicial review, the Court declines to review MMCI's decision.

**F. Conclusion**

The Court finds that under the facts of this case, MMCI is not a state actor. Moreover, even if MMCI were a state actor, it provided Dr. Stachura with due process of law. The Court further finds that Defendants are entitled to immunity under the HCIQA.

A judgment in accordance with this Memorandum Opinion will be entered.


_____
**JOE H. GALVAN**
**UNITED STATES MAGISTRATE JUDGE**